UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ALEXANDRA E. CONTRERAS,
o/b/o M.A.M.,

                                    Plaintiff,                          13-CV-06474 (JMF)(SN)

         -against-                                                      **REPORT AND**
                                                                        **RECOMMENDATION**

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

-------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE JESSE M. FURMAN:

         The plaintiff Alexandra E. Contreras, on behalf of her minor son, M.A.M., brings this

action *pro se* pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking

judicial review of the final determination of the Commissioner of Social Security denying

Contreras's application for M.A.M. to receive disability benefits. The Commissioner moves for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

         Because I conclude that substantial evidence supports the Commissioner's final

determination, and because the administrative law judge did not commit legal error justifying

remand, I recommend that the Commissioner's motion be GRANTED.

**PROCEDURAL BACKGROUND**

         On October 6, 2011, the plaintiff Alexandra E. Contreras filed an application for

Supplemental Security Income ("SSI") with the Social Security Administration (the "SSA") on

behalf of her nine-year-old son, M.A.M., who allegedly became disabled under the Social

Security Act due to Attention Deficit Hyperactivity Disorder ("ADHD"), asthma, and epilepsy on June 28, 2007. On December 14, 2011, the Commissioner denied the application, and on January 5, 2012, Contreras requested review of the Commissioner's decision at a hearing before an administrative law judge. Contreras and M.A.M. appeared without counsel for a hearing before Administrative Law Judge Michael Friedman (the "ALJ") on May 24, 2012. M.A.M. was denied disability benefits in a June 13, 2012 written decision. The Appeals Council denied Contreras's application for review of the ALJ's decision on July 23, 2013, thereby rendering the decision of the Commissioner final.

On September 10, 2013, Contreras, proceeding *pro se*, filed this action on behalf of M.A.M. pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), before the Honorable Jesse M. Furman. On October 7, 2013, Judge Furman referred this case to my docket for a report and recommendation. The Commissioner filed the administrative record on January 13, 2014, and filed a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure on March 17, 2014. The Court extended Contreras's time to oppose the motion to May 9, 2014, but she did not do so. The Commissioner did not file a reply.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

## I.    Social History

M.A.M. was born in New York City on October 13, 2001. He lives with his mother and younger brother and reports having a positive relationship with them, as well as with his father, who no longer lives with the family. M.A.M. participates in team sports, including baseball and basketball. He has been enrolled in general education classes at Public School 154 ("PS 154") in

2

Manhattan since pre-kindergarten. M.A.M. briefly attended a different school during the 2010-2011 school year, but returned to PS 154 due to problems with transportation.

On May 22, 2009, when M.A.M. was in the second grade, his school convened an Individualized Education Program ("IEP") Team to review whether M.A.M. required special education services. The IEP Team noted that M.A.M "has diagnoses of epilepsy, asthma and takes medication for ADHD." (T. 309.) The IEP Team found that M.A.M. was "non-handicapped" and recommended "General Education Program Only"; no special services were recommended. (T. 309.)

On November 18, 2011, when M.A.M. was in the fifth grade, an IEP Team again convened, this time recommending participation in the program Special Education Teacher Support Services. The IEP Team was comprised of Contreras, school psychologist Leslie Hinton, a special education teacher/district representative, a general education teacher, and a social worker. The IEP Team recommended that M.A.M. attend the program for three periods every week for English language arts, and for two periods every week for math. The IEP Team also recommended 30-minute group counseling sessions once a week. The goal of the counseling recommendation was to improve M.A.M.'s attention and concentration in class by encouraging him to complete his assignments, request assistance during class, and actively participate in class discussions. M.A.M. was found to have "age appropriate daily living skills," and the IEP notes that Contreras "reports no difficulties in this area." (T. 176.) M.A.M.'s teachers reported to the IEP Team that M.A.M. has "good peer and adult relationships and no significant problem behaviors." (T. 177.) It was also noted that M.A.M. makes friends easily. In addition to the Special Education Teacher Support Services program, the IEP Team considered recommending a "Special Class in a Community School," but it rejected the idea as "too restrictive" given

M.A.M.'s capabilities and needs. (T. 186.) M.A.M. began receiving special education services at some point after December 6, 2011, though it is not clear whether he received the weekly group counseling services.

## II.     Medical History

### A.     ADHD

On February 5, 2008, when M.A.M. was six years old, he was diagnosed with a psychiatric disorder by Dr. Alexander Alerte of the Northside Center for Child Development ("Northside"). Dr. Alerte found that, in the previous 12 months, M.A.M. had experienced moderate-to-severe functional problems in the areas of social relationships and self-direction/self-control. Dr. Alerte first diagnosed M.A.M. with anxiety disorder and impulse control disorder, but, by October 8, 2008, had changed the diagnosis to anxiety disorder and ADHD. He first prescribed the ADHD medication Concerta to M.A.M. on December 3, 2008. Dr. Alerte found that M.A.M. had a Global Assessment of Functioning ("GAF") score of 50 on February 5, 2008, and a GAF score of 55 on September 23, 2010.[1] M.A.M. stopped seeing Dr.

---

[1] GAF refers to a person's overall level of functioning and is assessed using a scale that provides ratings in ten ranges, with higher scores reflecting greater functioning. See DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 27 (4th ed. Text Revision 2000). A GAF score between 51 and 60 represents "moderate difficulty in social, occupational, or school functioning." Id. A GAF score of 41-50 represents serious symptoms or any serious impairment in social or occupational functioning.

The GAF scale was removed for the fifth edition of the DSM, which was published in 2013, because of the GAF's "conceptual lack of clarity" and "questionable psychometrics in routine practice." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-V-TR") 16 (5th ed. 2013). In addition, before the DSM-V abandoned the GAF scale, the SSA declined to endorse GAF scores for "use in the Social Security and SSI disability programs" because GAF scores have no "direct correlation to the severity requirements in [the SSA's] mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746-01, 50764-65, 2000 WL 1173632 (August 21, 2000); see also Santiago v. Colvin, 12 Civ. 7052 (GBD)(FM), 2014 WL 718424, at *20 n.10 (S.D.N.Y. Feb. 25, 2014) (citing id.) ("The [SSA] Commissioner has made clear that the GAF scale does not have a direct correlation to the severity requirements contained in the [regulations] that the ALJ considers [to determine whether the claimant has a *per se* disability].").

Alerte on September 23, 2010, due to a time conflict preventing him from attending regular medication counseling sessions. Dr. Alerte noted that Contreras planned to seek medication management from Dr. Reucar Quijada of Pediatrics 2000, M.A.M.'s pediatrician who had been providing primary health care treatment since M.A.M. was one. M.A.M. also continued to see Dr. Ruben Kuzniecky, a neurologist at the NYU Langone Medical Center, who began treating M.A.M. for seizures and ADHD on January 14, 2009.

On May 6, 2009, as part of M.A.M.'s second-grade IEP, school psychologist Leslie Hinton conducted a Psycho-educational Evaluation for M.A.M. According to M.A.M.'s teachers, M.A.M. was achieving at grade level in all his subjects and had "fair peer and adult relationships." (T. 313.) The results of a cognitive functioning test showed that M.A.M. was in the Average, High Average, or Superior Range in all functional areas. With regard to academic achievement, the test results showed that M.A.M.'s skills ranged from Average to Advanced. M.A.M.'s teachers reported that M.A.M. could become distracted and disruptive during class. Hinton found that M.A.M. "may need some assistance when confronted with feelings of frustration and/or anxiety." (T. 317.)

On February 24, 2011, when M.A.M. was nine years old, Nurse Practitioner Mary Carobene of the NYU Langone Medical Center, acting under Dr. Kuzniecky's supervision, noted that M.A.M.'s attention had been improving after his dosage of Concerta was increased. On May 19, 2011, Dr. Kuzniecky noted that the increased dosage of Concerta was helping to improve M.A.M.'s attention and that M.A.M.'s school performance was adequate.

On July 14, 2011, Dr. Quijada submitted a report to the SSA regarding his treatment of M.A.M. and his opinion as to M.A.M.'s functional capabilities. According to Dr. Quijada, M.A.M.'s ADHD symptoms were "under control with . . . Concerta." (T. 224.) Dr. Quijada

noted that M.A.M. had not displayed any behavior suggestive of a "significant psychiatric disorder," and that M.A.M.'s "function/behavior" was "age-appropriate" in all subcategories (fine/gross motor skills, sensory abilities, communication skills, cognitive skills, and social/emotional skills). (T. 226-27.) Dr. Quijada also found that M.A.M.'s most recent mental status examination was "normal" in all categories. Dr. Quijada's progress notes, the most recent of which is from March 9, 2012, indicate that M.A.M.'s symptoms remained stable with medication.

School psychologist Hinton re-evaluated M.A.M. on November 4, 2011, when M.A.M. was in the fifth grade. Hinton noted that there was no teacher's report available for the evaluation. The cognitive functioning test showed that M.A.M. was in the Low-Average range or higher for each category, and the academic achievement test showed that M.A.M.'s academic skills were in the Middle-Average range. With respect to M.A.M.'s social emotional functioning, his teacher reported that he had good relationships with adults and peers but needs assistance in staying focused during class. Hinton found that M.A.M.'s distractibility was having an impact on school performance.

As of May 7, 2012, M.A.M. was still under Dr. Kuzniecky's care and was taking Concerta and Ritalin to treat his ADHD.

**B.      Asthma**

M.A.M. has had asthma since early childhood and received treatment from Dr. Quijada, M.A.M.'s pediatrician since 2002. In September 2008, doctor notes from a neurologist state that M.A.M. has "mild persistent asthma controlled on Singulair." (T. 272.) In addition to regularly taking Singulair, M.A.M. was prescribed the inhaler Albuterol to take when needed. On November 15, 2011, Dr. Quijada reported that M.A.M.'s asthma was controlled by the

medication and that it did not affect any of M.A.M.'s activities. Dr. Quijada conducted a pediatric examination on February 21, 2012, and found M.A.M.'s health to be normal in all categories, including lungs and chest. None of the medical records refers specifically to M.A.M. experiencing an asthma attack. According to Contreras, M.A.M. had not had an asthma attack for at least one year before the date Contreras filed the SSA application. Contreras further stated that M.A.M.'s physical abilities are not limited by any of his impairments.

### C.   Epilepsy

M.A.M. experienced his first seizure in July 2008 while in the Dominican Republic visiting family. He was taken to a hospital where he was prescribed Trileptal, an anti-seizure medication. On September 15, 2008, Contreras brought M.A.M. to the Metropolitan Hospital Center ("Metropolitan"), where he saw Dr. Meenakshi Khosla and Dr. Jay E. Selman. Contreras told the doctors that on three occasions in August 2008 she noticed "abnormal flickering movements" in M.A.M.'s hand while he slept. (T. 272.) Dr. Khosla continued M.A.M. on Trileptal. He noted that a computed tomography ("CT") scan of the head was normal, that an electroencephalography ("EEG") showed epileptic activity suggestive of Benign Rolandic Epilepsy, and that physical and neurological examinations were normal.

On December 22, 2008, M.A.M. had a follow-up appointment at Metropolitan, where he was seen by Dr. Arun Aggarwal. Dr. Aggarwal took M.A.M. off the Trileptal on the basis that M.A.M. had only suffered one seizure episode, had received normal results for his examinations, and had a form of epilepsy Dr. Aggarwal described as a "benign process that improves with age." (T. 269.) Two days later, however, M.A.M. had his second seizure. He returned to Metropolitan and was treated by Dr. Selman and Dr. Aggarwal, who confirmed the diagnosis of

Benign Rolandic Epilepsy and put M.A.M. back on Trileptal. M.A.M. had a third seizure on January 1, 2009, which Contreras was able to control at home through medication.

M.A.M. did not return to Metropolitan, and his epilepsy was instead monitored by Dr. Quijada, his pediatrician. Dr. Quijada referred M.A.M. to neurologist Dr. Kuzniecky, who first saw M.A.M. on January 14, 2009. Dr. Kuzniecky continued to see M.A.M. every four months, each time noting that M.A.M. was seizure-free, though the tests continued to show epilepsy or partial epilepsy. On September 15, 2009, Dr. Kuzniecky diagnosed M.A.M. with a sleep disorder, for which he prescribed Clonidine, a medication that also helped to treat M.A.M.'s ADHD.

Contreras wrote on M.A.M.'s SSA application that his last seizure was on January 1, 2010. In his January 27, 2010 follow-up visit note, Dr. Kuzniecky did not specifically reference a seizure. He did note that "[r]ecent EEGV showed clear Rolandic spikes." (T. 336.) On August 31, 2011, Contreras reported to one of Dr. Kuzniecky's nurse practitioners that M.A.M. had not had a seizure "for almost 2 years." (T. 349.) The medical records appear to indicate that M.A.M.'s last seizure was on January 1, 2009. As of May 7, 2012, M.A.M. was under Dr. Kuzniecky's care and continued to take Trileptal for epilepsy.

## III.   Consultative Sources

### A.    Dr. Robert Lancer

Psychologist Dr. Robert Lancer performed a consultative examination on M.A.M. and issued a report dated November 18, 2011. Contreras attended the evaluation. Dr. Lancer did not state the source of his information but stated that M.A.M.'s scholastic performance was poor; M.A.M. was in special education; and, from 2008 to 2011, M.A.M. saw a psychiatrist and psychologist. Dr. Lancer further asserted that M.A.M. lost his temper easily, was aggressive and

destructive, had inappropriate social behavior, and had poor relationships with peers and adults.

He also stated that M.A.M. had attention and concentration difficulties, though appears to

describe these difficulties with different levels of severity in different sections of his report,

while not mentioning them at all in the "Medical Source Statement" section. M.A.M. had no

depressive or anxiety-related symptomatology, or thought disorder. M.A.M was taking Trileptal,

Concerta, Singulair, and Clonidine. Dr. Lancer noted that M.A.M. dressed, bathed, and groomed

himself at age-appropriate levels. M.A.M. pulled off clothing, put on clothing, and could button,

tie, and zip. M.A.M. spent his days going to school, watching television, and listening to music.

During the examination, M.A.M. was cooperative, and his manner of relating, social

skills, and overall presentation were age-appropriate. His motor behavior was restless; his gait

and posture were normal. He had "[m]ild articulation problems" and his "[o]verall intelligibility

was fair." (T. 203.) His thought processes were coherent and goal-directed, with no evidence of

hallucinations, delusions, or paranoia. His affect was full and appropriate in speech and thought

content. He was fully oriented, his mood neutral, and his sensorium clear. Dr. Lancer found that

M.A.M.'s attention and concentration were "[m]ildly impaired due to emotionality." (T. 204.)

His recent and remote memory skills were intact and age appropriate. His cognitive functioning

was average, and his insight and judgment were fair.

Based on his examination, Dr. Lancer found that M.A.M. could attend to, follow, and

understand age-appropriate directions, and complete age-appropriate tasks. He had difficulty

maintaining appropriate social behavior, difficulty appropriately responding to changes in the

environment, and learning in accordance to cognitive functioning. He also had difficulty asking

questions and requesting assistance in an age-appropriate manner. Dr. Lancer found that M.A.M.

"can be aware of danger and take needed precautions." (T. 204.) He had difficulty interacting

with adults. Dr. Lancer concluded, "Results of the examination appear to be consistent with psychiatric and this may significantly interfere with the claimant's ability to function on a daily basis." (T. 204.)

### B.    Dr. J. Randall

M.A.M.'s file was reviewed on December 12, 2011, by state agency pediatric consultant Dr. J. Randall. Dr. Randall concluded that M.A.M. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the "Listing of Impairments" provided in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). Dr. Randall further found that M.A.M. had less than "marked" limitations in the functional area of "acquiring and using information." Dr. Randall explained that M.A.M. had special education support, received weekly counseling, and his full IQ score had been low-average. M.A.M.'s other academic scores, though, were at or above grade level and suggested higher academic functioning. In attending and completing tasks, Dr. Randall found that M.A.M. had less than marked limitations. Dr. Randall noted that the evidence showed that M.A.M. was distractible but could be easily redirected. Dr. Randall further noted that M.A.M. had no limitations in interacting and relating to others. While Contreras reported that M.A.M. fought with his sibling, the evidence, including his IEP Team's report, described him as quiet, friendly, and cooperative, with good relationships with teachers and peers, and no behavior issues. He enjoyed playing sports and socializing with friends. Dr. Randall further found that M.A.M. had no limitations in moving about and manipulating objects. M.A.M. had less than marked limitations in caring for himself and in health and well-being.

IV.     **The Administrative Hearing**

On May 24, 2012, after waiving her right to representation, Contreras appeared with M.A.M. *pro se* for a hearing before ALJ Friedman. Both Contreras and M.A.M. testified at the hearing, with Contreras testifying through a Spanish-speaking interpreter.

The ALJ first confirmed that Contreras wished to proceed without counsel. He then asked Contreras about M.A.M.'s educational status. Contreras testified that M.A.M. was in the fifth grade and receiving both general education and special education services. She said that M.A.M. was receiving low grades because of his difficulty with concentration. When asked whether the medication was helping with his concentration, Contreras responded, "more or less." (T. 34.) At the time of the hearing, M.A.M. was not being treated by a psychiatrist or therapist.

Contreras told the ALJ that she brought with her to the hearing M.A.M.'s most recent report cards, which the ALJ reviewed. He noted that "there are some problems with reading and writing." (T. 35.) Contreras stated that M.A.M.'s performance in math had improved since receiving special education services. Contreras testified that M.A.M. has friends he likes to play with and that he attends gym class at school. With respect to M.A.M.'s physical conditions, Contreras affirmed that M.A.M.'s seizures were "controlled with the medication" and that "the medication is helping to control" M.A.M.'s asthma. (T. 34.)

The ALJ then called M.A.M. to testify, noting that M.A.M. wanted to participate in the hearing. M.A.M. said that he likes math, but does not like reading, and that when he comes home from school he watches television or plays with friends. M.A.M. said he fights with his brother sometimes. The ALJ then dismissed M.A.M. and called Contreras back to continue her testimony. Contreras added that M.A.M. likes to play videogames and play outside. When

11

Contreras stated that she did not have any further information to provide, the ALJ closed the

hearing. The hearing lasted approximately eleven minutes.

**DISCUSSION**

## I.      Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but

early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if,

from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v.

Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (citation omitted).

The Social Security Act "must be liberally applied, for it is a remedial statute intended to

include not exclude." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990). This is particularly true in

the case of *pro se* claimants, who "are entitled to a liberal construction of their pleadings," and,

therefore, their complaints "should be read to raise the strongest arguments that they

suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation

marks omitted); see Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y.

Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A

determination of the ALJ may be set aside only if it is based upon legal error or is not supported

by "'substantial evidence, considering the record as a whole.'" Brault v. Soc. Sec. Admin.,

Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (quoting Moran v. Astrue, 569 F.3d 108, 112 (2d Cir.

2009)); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a

mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise" (citation and internal quotation marks omitted; emphasis in original)).

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." Moran v. Astrue, 569 F.3d 108, 110 (2d Cir. 2009) (quoting Cruz, 912 F.2d at 11); Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982). Accordingly, in light of the non-adversarial nature of a benefits proceeding, the ALJ has the affirmative duty to develop the administrative record fully, even when a claimant is represented by counsel. See Moran, 569 F.3d at 112; Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (finding that an ALJ's duty to develop the record personally "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination").

II.     **Definition of Childhood Disability**

Under the Act, a child, defined as someone under the age of 18, is considered disabled if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(a)(3)(c)(i). To determine whether a child claimant qualifies for SSI, the ALJ must conduct a three-step inquiry. See Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004). The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. At step one, the ALJ must determine that the claimant is not engaged in any "substantial gainful activity." 20 C.F.R. § 416.924(b) ("If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or age, education, or work experience."). At step two, the ALJ must find that the child has a medically determinable severe impairment, i.e., an impairment or combination of impairments "that causes . . . more than minimal functional limitations." Id. § 416.924(c). At step three, in order to find that a child is disabled under the Act, the ALJ must find that an impairment or combination of impairments "meet[s], medically equal[s], or functionally equal[s] the [L]istings." Id. § 416.924(d). A Listing is met when the impairment satisfies all the criteria contained in the Listing. Id. § 416.925(d). An impairment medically equals a Listing "if it is at least equal in severity and duration to the criteria of any listed impairment." Id. § 416.926(a)-(b).

If a claimant's impairments do not meet or medically equal any of the Listings, the ALJ must determine whether they functionally equal a Listing. Impairments functionally equal a Listing where they result in "marked" limitations in two of the six domains of functioning or an

14

"extreme" limitation in one of the six domains. Id. § 416.926a(a). The six functional domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Id. §§ 416.926(a)-(d). Limitations will be considered "marked" when the impairment "interferes seriously with the child's ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(2)(i). A marked limitation "is the equivalent of the functioning [the ALJ] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id. For the sixth functional domain, "health and physical well-being," the ALJ will find a marked limitation where the child's impairments cause frequent illness or where the child has "frequent exacerbations of . . . impairment(s) that result in significant, documented symptoms or signs." Id. § 416.926a(e)(2)(iv). An "extreme" limitation is one that is "more than marked"; it "is the rating [the SSA] give[s] to the worst limitations," such as those demonstrated by "standardized testing . . . scores that are at least three standard deviations below the mean." Id. § 416.926a(e)(3)(i).

## III.    The ALJ's Determination

On June 13, 2012, after evaluating M.A.M.'s claims pursuant to the three-step sequence, the ALJ issued a decision finding that M.A.M. was not disabled within the meaning of the Act from October 6, 2011, the date his application was filed. The ALJ found at step one that M.A.M. had not engaged in substantial gainful activity since October 6, 2011. At step two, the ALJ found that M.A.M. had the following severe impairments: controlled seizures, controlled asthma, and ADHD with good IQ. Finally, at step three, the ALJ found that M.A.M. did not have impairments that, alone or in combination, met, medically equaled, or functionally equaled one

of the impairments in the Listing. Accordingly, he found that M.A.M. was not disabled under the Act and thus not eligible for SSI benefits.

In his decision, the ALJ discusses all of the most relevant documents from the administrative record, including Contreras's hearing testimony, the medical notes from Metropolitan, Dr. Kuzniecky's medical notes and reports, Dr. Quijada's medical notes and treating source opinion, Dr. Alerte's examination notes, M.A.M.'s IEP and psycho-educational evaluations, state agency consultant Dr. Randall's report, and consultative examiner Dr. Lancer's report. The ALJ afforded "great weight" to Dr. Quijada's opinion because it was supported by objective evidence and because Dr. Quijada had been providing primary care treatment since M.A.M. was one. (T. 19.) The ALJ also afforded "great weight" to Dr. Randall's opinion, finding it consistent with the psycho-educational evaluations, the IEP, and Dr. Lancer's report. (T. 20.)

With respect to functional capacity, the ALJ concluded that M.A.M. did not have "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning. The ALJ's conclusion was largely based on the medical evidence showing a "positive response to treatment" for all three impairments, demonstrating that the impairments are "controllable with medications and therefore not imposing limitations in [M.A.M.'s] ability to function." (T. 21.) The ALJ analyzed each of the six functional domains set forth in 20 C.F.R. §§ 416.926(a)-(d), finding that M.A.M. has either "less than marked" limitation or no limitation in all six. He first found that M.A.M. has less than marked limitation in acquiring and using information, citing M.A.M.'s test results showing average or above average cognitive functioning, full-scale IQ, and average academic skills. He found that M.A.M. has less than marked limitation in attending and completing tasks, citing teachers' comments from May 2009

16

stating that M.A.M. was performing at grade level in all subjects. The ALJ found no limitations in either interacting and relating with others or in moving about and manipulating objects, citing evidence that M.A.M. socializes with friends, has good relationships with adults, and plays various team sports. The ALJ also found that M.A.M. has no limitation in caring for himself. Finally, the ALJ found that M.A.M. has less than marked limitation in health and physical well-being. In support of this finding, the ALJ discussed the medications that have stabilized M.A.M.'s epilepsy, ADHD, and asthma for at least the previous two years, and the ongoing neurology treatment for epilepsy and ADHD provided by Dr. Kuzniecky. The ALJ also cited Dr. Quijada's treating source opinion, in which Dr. Quijada opined that M.A.M.'s epilepsy, ADHD, and asthma were under control; that M.A.M. displayed no behaviors indicative of significant psychiatric disorder; and that M.A.M.'s clinical and lab findings were normal. Accordingly, because M.A.M.'s impairments did not cause "marked" limitation in two or more functional domains or "extreme" limitation in at least one functional domain, the ALJ concluded that M.A.M. had not been disabled under the Act since he filed his SSA application on October 6, 2011.

**IV.    Analysis**

**A.      M.A.M.'s Epilepsy and Asthma**

Based on the administrative record as a whole, there is substantial evidence to support the ALJ's conclusion that M.A.M. was not disabled under the Act due to his epilepsy and asthma. According to all medical records and Contreras's own testimony, M.A.M.'s physical conditions – epilepsy and asthma – had been stabilized by a consistent course of medication for a considerable amount of time before October 6, 2011. In the SSA application, Contreras answered "No" in response to the question, "Are the child's physical abilities limited?" And there is no

evidence that M.A.M.'s physical conditions worsened after October 6, 2011. There is a discrepancy as to when M.A.M. last suffered a seizure, with Contreras claiming on an application form that it was January 1, 2010, rather than January 1, 2009, as indicated in other medical records. Nevertheless, whether M.A.M. was seizure-free for nearly two years or nearly three years before Contreras filed the SSA application is immaterial, as either would support the conclusion that M.A.M. was not functionally limited by epilepsy at or around the time his SSA application was filed. Likewise, there is no evidence suggesting that M.A.M. was in any way functionally limited by his asthma. M.A.M. was physically active, attended gym class, and enjoyed playing team sports.

Therefore, because none of the evidence in the administrative record, including Contreras's hearing testimony and SSA application, can be interpreted to indicate disability due to epilepsy or asthma, the ALJ's finding as to these two conditions are supported adequately by substantial evidence.

**B.    M.A.M.'s ADHD**

With respect to M.A.M.'s ADHD, however, an argument might be made that apparent gaps in the administrative record demonstrate the ALJ's failure to develop the record fully as required for a full and fair hearing. Therefore, the Court must determine whether the ALJ satisfied his duty to develop the record before assessing whether the ALJ's conclusion was supported by substantial evidence.

**1.    The ALJ's Duty to Develop the Record**

When the ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's medical history for at least a twelve-month period. 42 U.S.C. § 423(d)(5)(b), 20 C.F.R. § 404.1512(d). Further, the Act authorizes the Commissioner to "issue subpoenas

18

requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation." 42 U.S.C. § 405(d).

The Court of Appeals for the Second Circuit considers this statutory authorization to impose an affirmative duty on the ALJ to develop the record. See Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (finding that the duty of an ALJ to develop the record personally "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination"). Indeed, before a district court can evaluate the ALJ's conclusions, the court must ensure that the claimant received a full and fair hearing. See Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (holding that an ALJ must ensure that the claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act"); Cullinane v. Sec'y of Dep't of Health & Human Servs., 728 F.2d 137, 137 (2d Cir. 1984). "The ALJ's duty to develop the administrative record encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 256 (S.D.N.Y. 2010).

"Even when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" Moran, 569 F.3d at 112 (quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009)). When a claimant is pro se, however, "the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" Cruz, 912 F.2d at 11 (2d Cir. 1990) (quoting Echevarria, 685 F.2d at 755) (internal

19

quotation marks omitted). This entails a heightened obligation to ensure both the completeness and the fairness of the administrative hearing. See Cullinane v. Sec'y of Dep't of Health & Human Servs., 728 F.2d 137, 137 (2d Cir. 1984) (describing an ALJ's "affirmative duty to ensure that *pro se* disability insurance benefit claimants receive full and fair hearings"). When the ALJ has failed to develop the record adequately, the district court must remand to the Commissioner for further development. See, e.g., Pratts, 94 F.3d at 39.

In addition, because development of the record centers around the opinions and diagnoses of the claimant's treating physicians, ALJs are bound by the "treating physician rule," which instructs them to give controlling weight to the opinions of a claimant's treating physician where that opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). Consideration of the duty to develop the record, together with the treating physician rule, produces an obligation that encompasses the duty to obtain information from physicians who can provide opinions about the claimant. Cf. Calzada v. Asture, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician."). Indeed, the ALJ possesses the statutory authority to request that physicians provide clarification regarding the claimant's condition during the relevant period. 42 U.S.C. § 405(d).

Here, there is evidence indicating possible gaps in the record that are relevant to M.A.M.'s ADHD, which is the only condition that Contreras claims was actually limiting M.A.M. as of October 6, 2011. Dr. Lancer stated in his report that M.A.M. saw a psychiatrist and a psychologist from 2008 to 2011, but does not provide any further information. It is unclear

whether the psychiatrist is Dr. Alerte, who stopped treating M.A.M. in September 2010, and there are no records from a psychologist during this time. Similarly, there are no records regarding the special education services authorized in M.A.M.'s November 2011 IEP, a deficiency the ALJ acknowledges, nor are there records regarding the weekly counseling sessions authorized by the IEP. In addition, the record before the Court does not appear to contain the report cards that Contreras showed the ALJ during the hearing. Finally, the record also does not contain an opinion report from a treating psychiatrist or psychologist.

Such failure to develop the record can constitute legal error requiring remand to the ALJ for further consideration and record development. See, e.g., Pratts, 94 F.3d at 39. Nevertheless, an incomplete administrative record requires remand only where the ALJ made insufficient effort to procure missing documents, and those missing documents render the record inadequate for a court to determine if the ALJ's decision was supported by substantial evidence. That is, the administrative record need only be "adequate for [the ALJ] to make a determination as to disability." Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996). "And, when evidence in hand is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary, and a determination can be made based upon that evidence." Kinslow v. Colvin, 12 Civ. 1541 (GLS)(ESH), 2014 WL 788793, at *4 n.10 (N.D.N.Y. Feb. 25, 2014); see also 20 C.F.R. § 404.1520b(a) ("If all of the evidence [the ALJ] receive[s], including all medical opinion(s), is consistent and there is sufficient evidence for [the ALJ] to determine whether you are disabled, [the ALJ] will make [a] determination or decision based on that evidence."). If the evidence in the administrative record is otherwise sufficiently consistent and substantial to determine disability, remand is not appropriate even where the ALJ, for example, erroneously dismisses a treating physician's opinion without explanation (Zabala v. Astrue, 595 F.3d 402,

409-10 (2d Cir. 2010)); fails to re-contact a treating source who provided insufficiently clear

records (Micheli v. Astrue, 501 F. App'x 26, 29 (2d Cir. 2012)); or fails to procure any medical

source opinions (Tankisi v. Comm'r of Soc. Sec., 12-1398-cv, 2013 WL 1296489, at *4 (2d Cir.

Apr. 2, 2013)).

      Here, the administrative record was sufficient for the ALJ to determine that M.A.M. was

not disabled. Most importantly, unlike the majority of cases remanding for failure to develop the

record, the record here does not show significant conflicts in medical evidence. The only

evidence that might be construed as conflicting with other sources, both in terms of opinion and

asserted facts, is Dr. Lancer's report. The conflicting aspects of this report, however, are not

significant or credible enough to trigger the ALJ's duty to further develop the record. First, Dr.

Lancer is a non-treating consultative source; he saw M.A.M. only once; and his report contains

broad findings about M.A.M.'s behavior and academic performance that are not supported with

reference to any specific facts or records and are not corroborated by other record evidence.

Thus, Dr. Lancer's report does not carry weight sufficient for the conflicting aspects to have

bearing on the consistency of the record as a whole. Cf. 20 C.F.R. § 404.1527(c) (setting forth

factors for determining the appropriate weight to afford a medical opinion). Second, Dr. Lancer

does not explain how, or even when, he conducted his evaluation, what role Contreras had in the

evaluation, or where he obtained any of the factual information in his report. Third, Dr. Lancer's

report contains several factual statements that are unclear (e.g., M.A.M. "has an individual

education placement") or likely inaccurate (e.g., stating that M.A.M. "is in special education,"

when he was not authorized to receive special education until two weeks after Dr. Lancer's

report). Finally, Dr. Lancer's conclusion that M.A.M.'s impairment "may significantly interfere

with [his] ability to function on a daily basis" does not appear to be based primarily on M.A.M.'s

issues with attention, concentration, and academic achievement, which are the primary grounds on which Contreras is seeking SSI. Dr. Lancer does not refer to those issues in the Medical Source Statement section of his report, which contains the conclusion quoted above, but he does consider in that section that M.A.M. "has difficulty interacting with peers and difficulty interacting with adults," a finding contradicted throughout the record, including in the IEP report prepared 10 days earlier. (See T. 176-77 (stating that M.A.M.'s teachers report that he has "good peer and adult relationships" and "makes friends easily").) Therefore, to the extent that Dr. Lancer's report conflicts with other medical evidence or indicates documents or doctors unaccounted for in the record, the report is insufficient to require the ALJ to further develop the record or resolve ambiguities, both because of its weak credibility, and because, in its entirety, it is not ultimately inconsistent with the ALJ's conclusion that M.A.M. is not disabled.

With respect to special education and weekly counseling documents, their absence does not render the record inadequate. Contreras testified that M.A.M.'s academic performance had improved because of the special education services; it is thus unlikely that the records would be favorable to a finding of disability. Further, these records would have been prepared after Contreras filed the SSA application, and an ALJ has the minimal duty to develop a claimant's record for the 12 months *preceding* the date that the SSA application is filed. See 20 C.F.R. § 404.1512(d); 42 U.S.C. § 423(d)(5)(b). An ALJ's duty to develop the record may include a period after the SSA application is filed, but this duty typically is triggered where there is "reason to believe that the information was necessary to reach a decision." DeChirico v. Callahan, 134 F.3d 1177, 1184 (2d Cir. 1998). Thus, in light of the consistent evidence in the record and the extremely low likelihood that these special education and counseling records would have changed or significantly affected the ALJ's decision, it is not clear that the ALJ

committed legal error by not seeking them. And even if the ALJ did have a duty to seek the records in light of the claimant's *pro se* status, Contreras's testimony about the special education services, and the probative nature of these records to M.A.M.'s ADHD, the ALJ's legal error would be harmless in the context of the administrative record as a whole.

More clear, however, is that the ALJ erred by considering in his decision the fact that "the file is devoid of any evidence to establish that[,] in fact, [M.A.M.] attended the [special education] services" after they were authorized in December 2011. (T. 20.) Whether or not the ALJ had the duty to attempt to procure the special education records in this case, he plainly cannot decline to obtain them and then construe their absence as unfavorable evidence against Contreras. Further, the ALJ is wrong that the record "is devoid of any evidence" that M.A.M. attended the special education services; Contreras provided testimony as to this fact. And to the extent that the ALJ found that relevant information could not be gleaned from the record, he had an obligation to question Contreras about that information during the administrative hearing. Instead, the ALJ conducted a cursory, 11-minute-long hearing in which he elicited no specific information regarding M.A.M.'s ADHD symptoms or his past psychological treatment. Nevertheless, because the record does not contain meaningfully conflicting evidence and because there is no basis for believing that any further development of the record would be favorable to a finding that M.A.M. is disabled, any such errors committed by the ALJ were harmless and do not compel remand.

Lastly, the ALJ's failure to procure a treating source opinion from Dr. Alerte was not a legal error. As the physician who originally diagnosed M.A.M. with ADHD and other psychiatric disorders, and as the only psychiatrist who appears to have treated M.A.M., an opinion report may have been helpful. It was not, however, essential. The record contains

24

extensive medical notes regarding treatment and medication management from Dr. Alerte, which generally indicate that M.A.M. was doing well on the Concerta and Clonidine. Additionally, Dr. Alerte had not seen M.A.M. for over 12 months by the time Contreras filed his SSA application. While an ALJ in some circumstances will have a duty to develop the record beyond the 12-month period preceding the filing date, records older than 12 months are less likely probative of the relevant disability timeframe in the case of a nine-year-old boy's concentration abilities and classroom behavior, which would be expected to change considerably as the child gets older. Regardless of whether the ALJ's duty to develop the record extended beyond the 12-month period in this case, an administrative record can have no treating source opinions and still be considered fully developed. See Tankisi, 521 F. App'x at 33. The record here contains a treating source opinion from Dr. Quijada, who was treating M.A.M. at the time his application was filed and had been treating him since 2002. The record also contains Dr. Alerte's extensive medication management notes; and there is no basis to assume that an opinion report from Dr. Alerte would be any more favorable to Contreras and M.A.M. than the consistent medical evidence already in the record. Therefore, the ALJ did not err by failing to procure a treating source opinion from Dr. Alerte.

Based on the foregoing considerations and an analysis of the administrative record as a whole, the Court finds that any legal errors committed by the ALJ with respect to failing to develop the record were harmless and would not justify remand.

### 2.    Substantial Evidence

As discussed above, the medical evidence in the record is consistent, and the changes in M.A.M.'s needs are not unexpected for a child facing increasingly difficult challenges as he progresses through grade school up to the fifth grade. Contreras's claims in the SSA application

are premised almost exclusively on M.A.M.'s academic performance. The record, however, shows that, in M.A.M.'s weakest academic areas, he is still in the low-average range, while in his strongest areas, he is either in the high-average or superior range. Additionally, reports from M.A.M.'s teachers are mostly positive and do not convey anything more serious than a child who can be easily distracted and occasionally disruptive during class. M.A.M. has never been held back in school and has always been in general education classes. M.A.M. had not been approved for any special education services until after Contreras submitted his SSA application, at which point he remained in general education classes while spending several periods each week receiving special education services for English and math. Within a few months of M.A.M. receiving these services, Contreras reported at the hearing that his academic performance in math was improving because of the services. This educational evidence is consistent with the medical findings and opinions of M.A.M.'s treating and non-treating physicians.

Therefore, because there is substantial evidence to support the ALJ's finding that M.A.M. does not have "marked" or "extreme" limitations in any of the six functional domains and thus is not disabled under the Act, the ALJ's decision should be affirmed.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's motion for judgment on the pleadings be GRANTED.

*     *     *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service

is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another

party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Jesse M. Furman at the Thurgood Marshall Courthouse, 40 Foley

Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must

be addressed to Judge Furman. The failure to file these timely objections will result in a waiver

of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            September 12, 2014


cc:         Alexandre Contreras (*By Chambers*)
            212 West 129th Street, Apt. #3D
            New York, New York 10027